UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNOBSKEY CORP., )<br> )<br>     Plaintiff )<br> )<br>v. )<br> )<br>MARCHIN LTD, and )<br>MARDEN'S d/b/a/ MARDEN'S, INC. )<br>AND MARDEN'S SURPLUS & )<br>SALVAGE )<br> )<br>     Defendants. ) | CV-06-139-B-W |

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Next to Marden's retail store in Calais, Maine, is a parking lot used by its customers and owned by Unobskey Corp. (Unobskey).[1] As owner of the parking lot, Unobskey would like Marden's to pay rent for its use; Marden's would prefer not to. Marden's argues that when it bought its building, it purchased the right to use the Unobskey lot; that the city of Calais variance grants it the right to use the Unobskey lot free of charge; that Unobskey is estopped from claiming rent; and, that Unobskey's claim is barred by the statute of limitations. Unconvinced by Unobskey's claim of unjust enrichment and convinced by Marden's first argument, the Court grants summary judgment in Marden's favor.

### I.    STATEMENT OF FACTS

In 1990, Unobskey constructed a building and parking lot in Calais, Maine for Rich's Department Store.[2] DSMF ¶ 1; PRSMF ¶ 1. Unobskey had previously requested – and on

---

[1] The Defendant is three entities, Marchin LTD, Marden's, and Marden's Surplus, which the Court refers to collectively as Marden's.

[2] Unobskey Corp. received title to the land from Sidney Unobskey on May 21, 1990. PSMF ¶ 4; DOSMF ¶ 4. The city of Calais granted a parking variance in 1989 to Sidney Unobskey, the then owner. DSMF ¶ 2 Attach. 1.

December 21, 1989, obtained – a variance from the city of Calais to construct a parking lot with a 300-car capacity, rather than the required capacity of 350 cars. DSMF ¶ 2; PRSMF ¶ 2. In granting the variance, the City mandated that Unobskey make the parking lot available to other businesses in the shopping center.[3] *Id.* Thus, even though Unobskey constructed the parking lot for Rich's, it made the lot available to other downtown merchants, including Marianne's, Mr. Paperback, Angelholm, Record Town, and the State Twin Cinema. DSMF ¶ 2; PRSMF ¶¶ 1, 2. At the time, Unobskey had an ownership interest in the properties where Marianne's, Mr. Paperback, and Record Town were located, but not where Angelholm or the State Twin Cinema were located. DSMF ¶ 2; PRSMF ¶ 2.

In April 1990, Rich's and Unobskey entered into a lease which made the building and parking lot available to Rich's in exchange for rental payments.[4] PSMF ¶ 18; DOSMF ¶ 18; *Second Decl. of Sidney Unobskey* Ex. A (*Lease*). According to the lease, Rich's was responsible for maintaining the parking lot, which was defined as a "Common Area," keeping it "at all times safe, clean and free of refuse, obstructions, ice and snow, properly sanded, well paved and marked for parking and traffic flow . . . ." *Lease* at 21. The lease also recognized that even though Unobskey did not own the buildings occupied by Angelholm Restaurant or State Twin Cinema, their customers had access to the common areas without contributing to Rich's "Common Area Costs." *Id.* at 21-22.

---

Although this is not part of the record, the parties have proceeded on the assumption that the municipal variance was binding on Unobskey Corp.
[3] The variance stated:

> Construct 300 car parking lot rather than a 350 car parking lot. The parking lot shall be available for other downtown merchants including but not limited to the following: Mariannes, Mr. Paperback, Angelholm, Record Town, and the State Twin Cinema.

DOSMF Attach. 1.
[4] Marden's also argues that Rich's had access to the parking lot through the variance from the city of Calais. DOSMF ¶ 18.

To finance the building project, Unobskey entered into a mortgage and security agreement with MetLife Capital Credit Corporation (MetLife) on November 12, 1990.[5]  DSMF ¶ 8; PRSMF ¶ 8.  The security for the mortgage included the store building and the land beneath it.[6]  *Id.*  The agreement also provided:

> As further security for payment of the indebtedness and performance of the obligations, covenants and agreements secured hereby, Grantor hereby transfers, sets over and assigns to Grantee:
> . . .
> The right to use in common with Grantor and persons from time to time operating businesses in such other premises as are described in subsection 7.02(a) of the Lease, and all persons from time to time claiming under them all Common Areas, which shall include all parking areas and other facilities of any kind or nature shown on Exhibit A to the Lease.  The terms Shopping Center, Trailer Storage Area and Common Areas shall have the meanings as defined in the lease.

DSMF Attach. 5. Rich's filed for bankruptcy in 1995, rejected the lease, and stopped making payments to Unobskey.  PSMF ¶ 20; DOSMF ¶ 20.  As a result, Unobskey failed to make mortgage payments to MetLife, and MetLife foreclosed.  PSMF ¶¶ 20, 22-23; DOSMF ¶¶ 20, 22-23.

In 1997, after the foreclosure, Marden's investigated purchasing the old Rich's department store building in Calais.  DSMF ¶ 6; PRSMF ¶ 6.  Because the parking lot was not for sale, Mickey Marden, Chief Executive Officer of Marden's, directed Paul LePage, its General Manager, to look into the parking issue.  *Id*.  Mr. LePage spoke with Calais officials and reviewed a number of documents, including the Certificate of Variance, a letter dated January 3,

---

[5] Exhibit A of Plaintiff's Reply to Defendants' Statement of Material Facts is the original mortgage and security agreement between Unobskey Corp. and MetLife, in the amount of $1,850,000.  PRSMF Ex. A.
[6] Unobskey qualified its response, stating that "the language quoted in paragraph 8 of [DSMF] is only a portion of the mortgage and security agreement . . . ."  PRSMF ¶ 8.  As this "qualification" does not adequately controvert the fact, the Court deems paragraph eight admitted.

3

1989,[7] and a letter dated March 28, 1990.[8]  *Id*.  Marden's used this information, in part, to decide whether to purchase the building.  *Id*.

In addition, Mr. Marden contacted Sidney Unobskey to inform him that he was interested in purchasing the old Rich's building at the foreclosure sale, but was not going to buy it until the parking issue was worked out.  DSMF ¶ 14; PRSMF ¶ 14.  At a subsequent meeting, Mr. Unobskey told Mr. Marden that "as long as he lived . . . he could allow his customers to park on [Unobskey's] parking lot free, at no cost to him, as long as he took care of everything."  DSMF ¶ 15; PRSMF ¶ 15.  Based on this assurance guaranteed by a handshake, Mr. Marden "made the deal to buy the building."  DSMF ¶ 16; PRSMF ¶ 16.

At the foreclosure auction sale, Marden & Hutchins Realty Co., Marchin's predecessor-in-title, purchased the old Rich's building and the land beneath it for approximately $400,000.[9]

---

[7] A letter from Frank O'Hara, Unobskey's authorized representative on the Rich's deal, to Nancy Orr, the city manager for Calais, addressed whether the parking lot should serve as security for financing the project.  The letter reads, in part:

> And if a default does happen to occur, the parking lot adds nothing to the City and State's security position.  This is because even in the unlikely event of a Rich's default, the parking lot must remain a downtown parking lot, due to legal commitments to other stores, local zoning, and the requirements of re-opening the main store.  This is true whether its ownership is under Mr. Unobskey, the City, or the State.
>
> In summary, a large, well-maintained, free parking lot is a major asset to Calais and its downtown.  However, it is of little value as financial security.  The store, the land underneath, access to the 300 car lot and Main Street, are adequate security for all lenders, assuming the favorable financial terms remain in force.

DSMF Attach. 3.

[8] A letter from Mr. O'Hara to David Sowell and Jim Lanigan explained why Unobskey did not want the parking lot to be security for the loan:

> The free parking lot, in any case, has little collateral value.  Its only potential is if it is sold for other income-producing uses.  Rich's, City officials, and Mr. Unobskey, are united in their belief that the space should remain free parking for downtown, and this intention is expressed in local zoning requirements, the Rich's lease, and other leases downtown.

DSMF Attach. 4.

[9] Marden's does not deny this fact or dispute the amount paid, but "qualifies" the statement: "Marden & Hutchins Realty Co. purchased the building but the price should not be considered as it is irrelevant to the issues before the

4

PSMF ¶ 24; DOSMF ¶ 24.  On May 28, 1997, MetLife conveyed to Marden & Hutchins title to the building and land and associated parking rights held by MetLife.[10]  DSMF ¶ 10; PRSMF ¶ 10.  On June 30, 1997, Marden & Hutchins conveyed title to Defendant Marchin LTD, which in turn gave a mortgage of the building and land to Marden's, Inc.  DSMF ¶¶ 11, 12; PRSMF ¶¶ 11, 12.  The building is now the site of a retail store owned and operated by Marden's.  PSMF ¶ 8; DOSMF ¶ 8.

From Mickey Marden's death in November 2002 until the beginning of 2006, Unobskey never demanded payment from Marden's for the use of the parking lot and no payment was made.  DSMF ¶ 17; PRSMF ¶ 17.  However, since purchasing the property, Marden's has paid a total of $63,509.75 for all plowing, sanding, maintenance, and repairs to the parking lot without any reimbursement from Unobskey.[11]  DSMF ¶¶ 18, 19; PRSMF ¶¶ 18, 19.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to . . . judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Buchanan v. Maine*, 469 F.3d 158, 166 (1st Cir. 2006).  Summary judgment may enter when a plaintiff fails to show sufficient evidence to establish an essential element of his case on which he bears the burden of proof at trial.  *See Celotex Corp. v.*

---

Court."  DOSMF ¶ 24.  As this is an action for unjust enrichment, the price paid for the property is relevant; the Court overrules the objection.

[10]  With regard to parking rights, the language quitclaim deed with covenant contained the same language as the mortgage between MetLife and Unobskey.  However, as Unobskey points out in its qualified response: "The scope and extent of those rights are to be determined by the Court from the documents in the record and are at the core of the dispute in this matter."  PRSMF ¶ 10.

[11]  Marden's claims it has spent a total of $63,509.75 to maintain the parking lot.  DSMF ¶ 19.  This statement is supported by a record citation to the affidavit of Mr. LePage, who is the General Manager of Marden's, Inc.  Unobskey qualified this statement:  "Plaintiff has no way to verify the $63,509.75 figure contained in Mr. LePage's affidavit, and Defendants have failed to provide any independent verification of that figure."  PRSMF ¶ 19.  As this "qualification" does not adequately controvert the fact, the Court deems paragraph nineteen admitted.

*Catrett*, 477 U.S. 317, 322 (1986). "Once the movant avers 'an absence of evidence to support the nonmoving party's case,' the latter must adduce specific facts establishing the existence of at least one issue that is both 'genuine' and 'material.'" *Sheinkopf v. Stone*, 927 F.2d 1259, 1261 (1st Cir. 1991) (citations omitted). A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000) (quoting *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)). For an issue to be "genuine," the evidence relevant to the issue, viewed in the light most flattering to the nonmoving party, must be "sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "[C]onclusory allegations, improbable inferences, and unsupported speculation" are insufficient to establish a genuine dispute of fact. *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). Rather, "[t]he evidence illustrating the factual controversy . . . must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve . . . ." *Mack v. Great Atl. & Pac. Tea Co., Inc.*, 871 F.2d 179, 181 (1st. Cir. 1989) (citing *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975)).

### III. DISCUSSION

#### A. Plaintiff's Claim

Unobskey's chief complaint is that Marden's has been unjustly enriched by its free use of the parking lot adjacent to the store, to the tune of $3,150,000. *See Compl*. ¶¶ 42-45. Unobskey concedes no unjust enrichment claim lies from the time Marden's bought the store until Mr. Marden died in 2002, due to Messrs. Unobskey and Marden's agreement allowing Marden's to use the parking lot without charge during Mr. Marden's lifetime. *See Pl.'s Opp'n to Defs.'*

*Cross-Mot. for Summ. J.* at 6 n.1 (Docket # 23) (*Pl.'s Opp'n*). However, according to Unobskey, that agreement terminated with Mr. Marden's death and since that date Marden's has been unjustly enriched. *Id.*

To make out a *prima facie* case of unjust enrichment under Maine law, a party must establish: "(1) it conferred a benefit on the other party; (2) the other party had appreciation or knowledge of the benefit; and, (3) the acceptance or retention of the benefit was under such circumstances as to make it inequitable for it to retain the benefit without payment of its value." *Maine Eye Care Assocs., P.A. v. Gorman*, 2006 ME 15, ¶ 26, 890 A.2d 707, 712 (quoting *Tucci v. City of Biddeford*, 2005 ME 7, ¶ 14, 864 A.2d 185, 189).

There is no dispute that Marden's has received the benefit of using the Unobskey parking lot since 2002 without paying rent. The parties disagree, however, about whether Unobskey conferred this benefit on Marden's. Unobskey makes the practical point that as it owns the parking lot and as Marden's is using its property for free, it must be conferring a benefit on Marden's. *Pl.'s Mot. for Sum. J.* at 5 (Docket # 15). Marden's counters that Unobskey conferred no benefit because Marden's obtained a right of access to the parking lot in the form of an easement from the MetLife deed. *Defs.' Resp. to Pl.'s Mot for Summ. J.* at 2-3 (Docket # 17).

### 1. The Rights Marden's Acquired By Deed

When Marden's purchased the property from MetLife, it obtained the same legal rights to the parking lot that MetLife obtained when it foreclosed on the property; in turn, MetLife's security interest in the property defines its legal rights. The threshold issue, therefore, is what rights to the parking lot MetLife received from Unobskey upon foreclosure.[12]

---

[12] At oral argument, Unobskey made the eminently practical point that as a business matter, the resulting arrangement makes no sense. Unobskey argued that its willingness to allow Rich's to use a significant portion of the parking lot must be seen as a function of the rental payments Rich's was obligated to pay Unobskey under the lease. Once the lease terminated, Unobskey contended, it defies common sense to interpret the arrangement so that

7

The language of the mortgage and security agreement is decisive and expressly includes the right to use the parking lot:

> [Unobskey] transfers, sets over, and assigns to [MetLife] . . . the right to use in common with [Unobskey] and other persons from time to time operating businesses in such other premises as are described in subsection 7.02(a) of the Lease, and all persons from time to time claiming under them all Common Areas, which shall include all parking areas and other facilities of any kind or nature shown on Exhibit A to the Lease. The terms Shopping Center, Trailer Storage Area, and Common Areas shall have the meanings as defined in the Lease.[13]

DSMF Attach. 5. This provision of the mortgage makes sense; the value of retail space must be a function of the ability of customers to access it. Thus, if required to foreclose and assume title to the property, MetLife needed to assure that the right to accessible parking would be transferred upon foreclosure. Once MetLife foreclosed, it obtained the "right to use . . . all Common Areas, which shall include all parking areas" and it transferred those same rights to

---

Unobskey, which after all owns a valuable parking lot, is required in perpetuity to allow a non-tenant to use a substantial portion of its parking lot scot free.

Unobskey warned of untoward consequences, stating that if the Court rules in favor of Marden's, Unobskey would simply cease maintaining the parking lot and would leave Marden's customers without desirable access to the store. Further, the other merchants around the lot and the city of Calais itself would become concerned that a parking lot in the middle of its downtown was deteriorating.

Be this as it may, it is not wholly uncommon that the law works in ways that "might strike lay persons as peculiar." *See United States v. Reccko*, 151 F.3d 29, 31 (1st Cir. 1998) (addressing the sentencing guidelines). Businesses, like individuals, routinely engage in conduct that in retrospect seems markedly ill-advised, but the law rarely saves parties from the consequences of their own knowing actions. More to the point, none of this is a matter of record and cannot at this stage, if ever, be considered.

[13] In the lease agreement between Rich's and Unobskey, the term "Common Areas" was defined: "All parking areas and all other common areas and facilities of any kind or nature shown on Exhibit A or existing from time to time in the Shopping Center which are permitted to be used by Tenant and the persons described in Section 7.02(a) hereof." *Lease* at 2.

Section 7.02(a) of the lease provided that Angelholm Restaurant and State Twin Cinema, though not owned by Unobskey, had the right to use the parking lot without Unobskey contributing to Rich's "common area costs" as defined in Section 7.02(b). That section also provided that the businesses located in other sites owned by Unobskey – Mr. Paperback, Record Town, and the former Misty Blue – had the right to use the common areas without contribution by Unobskey, "unless and until a customer entrance for a particular such site is constructed onto the Common Areas, whereupon contributions to [Rich's] Common Area Costs will be due for that site and the floor area of the buildings on that site will be considered in Tenant's Fraction . . . ." *Id.* at 22. Logically, businesses in Unobskey's buildings would contribute to maintenance costs to the extent they had entrances on the common area, but Unobskey could not force non-tenants to contribute to the maintenance costs, especially since the city's variance gives non-tenants the right to park in the lot.

Marden's upon the foreclosure sale.[14] This analysis strongly supports Marden's argument that it obtained the right to use the parking lot for its customers when it purchased the building and attendant rights from MetLife.[15]

Unobskey first responds that it could not convey the right to use the parking lot, because that right was, by virtue of the lease, vested with Rich's, not Unobskey:

> [A]lthough the Parking Lot belonged to Unobskey at the time the Mortgage was executed, that parcel of real estate was *not* subject to the Mortgage. Only the right to *use* the Parking Lot *"as defined in the Lease"* was subject to the mortgage, and that right did not belong to Unobskey at the time the Mortgage was executed - - it belonged to Rich's pursuant to the lease that was executed seven months *prior* to the Mortgage. The only party that could assign the right to use the Parking Lot "as defined in the Lease" to MetLife was Rich's, and no such assignment ever occurred.

*Pl.'s Reply Brief in Support of Its Mot. for Sum. J.* at 3-4 (Docket # 21) (*Pl.'s Reply*) (emphases in original). Unobskey cites the sensible proposition that "[o]ne cannot convey land, nor create an easement in it, unless he owns it." *Id.* at 4 (quoting *Dorman v. Bates Mfg. Co.*, 82 Me. 438, 448, 19 A.2d 915, 916 (1890)).

Unobskey's contention does not withstand analysis. Unobskey did not transfer to MetLife a legal interest it did not own; Unobskey owned the parking lot and still owns it today. On November 12, 1990, Unobskey itself assigned the right to use the parking lot to MetLife "as further security for payment of the indebtedness . . . ." DSMF Attach. 5. Upon foreclosure,

---

[14] The Quitclaim Deed from MetLife to Marden's stated that MetLife transferred to Marden's "[t]he right to use in common with the Grantor and persons from time to time operating businesses in such other premises as are described in subsection 7.02(a) of the Lease, and all persons claiming under them all Common Areas, which shall include all parking areas and other facilities of any kind or nature shown on Exhibit A of the lease." DSMF ¶ 10 Attach. 7; PRDSMF ¶ 10.

[15] At oral argument, Unobskey raised the novel argument that the language in the easement created a "latent ambiguity," which merits judicial correction, since the language as interpreted would create an absurd result. In support, Unobskey cited *Slipp v. Stover*, 651 A.2d 824 (Me. 1994). Though the argument is admirably ingenious, *Stover* does not apply. In *Stover*, the Maine Supreme Judicial Court reiterated that "[a] latent ambiguity in a deed is created when, in applying the description to the ground, facts extrinsic to the document *controvert or in some way render unclear* the deed's apparently unambiguous terms." *Id.* at 826 (quoting *Taylor v. Hanson*, 541 A.2d 155, 157 (Me. 1988) (emphasis in *Stover*)). For example, in *Taylor*, two roads described in a deed as parallel were not in fact parallel. Here, the extrinsic evidence that Unobskey and MetLife never intended this result is at best debatable and in any event not as plain as the physical location of two roads.

9

MetLife succeeded to the rights that Unobskey had transferred as security, including the "right to use . . . all parking areas . . . ." *Id.* To obtain the MetLife loan, Unobskey transferred the right to use the parking lot as security and it is in no position to object, the security having been properly foreclosed, that MetLife transferred the easement to a purchaser at the foreclosure sale.[16] Seeking equitable relief, Unobskey is hardly in the position to disavow the exercise of rights it itself conveyed.[17]

Next, Unobskey makes a variation of the same point, based on what it contends is limiting language in the mortgage. Unobskey points out that the mortgage did not transfer legal title to the parking lot; rather, it transferred only the right to use the parking lot "as defined in the lease." *Pl.'s Reply* at 3-4. Unobskey again contends that because Rich's, not Unobskey, held the right to use the parking lot when the mortgage was signed, only Rich's could transfer the right to use the parking lot. *Id.*

The language of the mortgage, however, flatly contradicts Unobskey's interpretation. The mortgage expressly transferred to MetLife as mortgagee the "right to use . . . all Common Areas, which shall include all parking areas . . . ." DSMF Attach. 5. Moreover, as the remaining language of the mortgage makes plain, Unobskey and MetLife were highly cognizant of the significance of the right to use the parking lot and the mortgage expressly provided that the right would survive foreclosure.

> [Unobskey] further warrants and agrees that, if the outcome of the action entitled <u>Kathleen Sellars vs. Unobskey Corporation</u>, now pending in Washington County Superior Court, results in the loss of parking spaces from the Common Areas (such as that term is defined in the Lease) so that the variance granted by the City

---

[16] The Mortgage and Security Agreement between Unobskey and MetLife specifically states in the opening paragraph: "Unobskey . . . does give . . . unto MetLife . . . [and MetLife's] successors . . . all easements and rights appurtenant thereto." DSMF Attach. 5.

[17] If the lease had remained in force, Rich's may have had the right to object to Unobskey granting to a third party the same parking rights it enjoyed under the lease. However, Rich's legal rights have been foreclosed and Unobskey has no standing to complain on behalf of Rich's.

> of Calais to [Unobskey] with respect to the number of parking spaces allowed is violated, then [Unobskey] shall either obtain a revised variance or construct additional parking spaces in the Common Areas so that the number of parking spaces is in compliance with the variance granted by the City of Calais.
>
> . . .
>
> [MetLife] agrees, however, that [Unobskey's] failure to either obtain a revised variance or construct additional parking spaces in the Common Areas so that the number of parking spaces is in compliance with the variance will not be deemed an Event of Default unless or until the City of Calais commences proceedings or an action because of the variance which would result in the inability of Rich's to continue its business as presently conducted. If and when the City of Calais commences such a proceeding or action, in addition to any other rights or remedies [Metlife] may have under the Mortgage, and notwithstanding the provisions of paragraph 25(a) hereof, [MetLife] shall have the right of specific performance against [Unobskey] to require [Unobskey] to either obtain a revised variance or construct additional parking spaces as set forth above. *The parties agree that the right of specific performance shall survive foreclosure and sale of the Premises and that such right of specific performance shall be assignable to [MetLife's] successors and assigns in the event of such a sale, whether or not this Mortgage is discharged.*

PRSMF Ex. A at 4-4A (emphasis added).

This language confirms that Unobskey and MetLife considered MetLife's security interest in the right to use the parking lot central to the mortgage. Significantly, the parties anticipated that if MetLife foreclosed, the "right of specific performance shall survive foreclosure and sale of the Premises," and further stipulated that "such right of specific performance shall be assignable to [Metlife's] successors and assigns in the event of such a sale . . . ." This language dispels Unobskey's claim that the right to use the parking lot did not survive a foreclosure or that Unobskey was not bound to honor the easement upon sale after foreclosure.

Finally, to the extent it relies upon the terms of the lease, Unobskey's position is further weakened because Unobskey no longer owns the building Marden's occupies. Compared to businesses described in Section 7.02 of the Rich's lease, Marden's is more akin to Angelholm or the State Twin Cinema, which under the lease are able to use the parking lot rent-free, than to

11

Mariannes, Mr. Paperback, or Record Town, which are located in Unobskey buildings and pay rent accordingly.

Complicating the matter is the conversation between Messrs. Marden and Unobskey in which Mr. Unobskey reassured Mr. Marden that his customers could park in the Unobskey lot without cost – other than maintenance – for as long as Mr. Marden lived. DSMF ¶¶ 14-16; PRSMF ¶¶ 14-16. Unobskey confirmed at oral argument that it is not seeking to enforce the terms of this oral agreement.[18] Instead, Unobskey argues that the conversation between Messrs. Marden and Unobskey confirmed that Marden's was "aware, prior to buying the Building, that there were 'issues' regarding parking and that they based their decision to buy the building upon the deal struck by Mickey Marden and Sidney Unobskey – not upon the language of the variance or the letters from Frank O'Hara." *Pl.'s Opp'n* at 6. But, this conversation does not affect the legal rights that Unobskey transferred to MetLife and that MetLife subsequently transferred to Marden's. Mr. Marden's prudent conversation with the owner of the parking lot where he anticipated his customers would park does not alter the essential question of whether Marden's had the legal right to use the parking lot.

When Marden's purchased the old Rich's building at the foreclosure sale, it bought the building and the attendant rights contained in the deed for valuable consideration – $400,000 – including the right to use the adjacent parking lot. The Court denies Unobskey's motion for summary judgment because it has failed to meet its burden as to its claim for unjust enrichment.

B.   **Marden's Cross-Motion**

Marden's submits five arguments in support of its cross-motion for summary judgment: (1) that it acquired an easement to use the parking lot from MetLife's deed; (2) that the city's

---

[18] The Court questioned Unobskey's counsel about whether the agreement would run afoul of the statute of frauds, 33 M.R.S.A. § 51, and Mr. Israel accurately responded that his client was not seeking to enforce the terms of the agreement. It was only when the agreement ended that Unobskey sought to make Marden's pay for its use of the lot.

12

variance provides a right to use the lot; (3) that Unobskey is barred from charging rent to Marden's under a theory of promissory estoppel; (4) that Unobskey is barred by the statute of limitations under Maine law; and, (5) that Marden's has not been unjustly enriched. The Court concludes that Marden's has established that it obtained an easement to use the parking lot from MetLife when it purchased the property at the foreclosure sale; therefore, the Court does not reach the remaining arguments.

### 1. Easement

Marden's argues that the language of the mortgage created an express easement for use of the parking lot:

> As further security for payment of the indebtedness and performance of the obligations, covenants and agreements secured hereby, [Unobskey] hereby transfers, sets over and assigns to [MetLife]: (i) All rights to use in common with [Unobskey] and other persons all rights of access to and egress from the Premises . . . (ii) the right to continuous and unobstructed use of any service area for the Premises . . . (iii) the right to park delivery trailers in the Trailer Storage Area . . . (iv) the right to locate a trash compactor or other trash receptacle in the area shown therefore on Exhibit A of the Lease, (v) the right . . . to store and/or sell merchandise on the sidewalks adjacent to the premises . . . and (vi) the right to use in common with [Unobskey] . . . all Common Areas, which shall include all parking areas and other facilities of any kind or nature shown on Exhibit A to the lease.

DSMF Attach. 5. The parties agree that this language granted an easement under Maine law.[19] *Bonney v. Greenwood*, 96 Me. 335, 341, 52 A.2d 786, 789 (1902) (Defining an easement as "a privilege without profit which one has for the benefit of his land in the land of another."). In *Bonney*, the Law Court observed that it is "among the essential qualities of every easement that there are two distinct tenements or estates, the dominant to which the right belongs, and the servient upon which the obligation is imposed." *Id.*; *see* Knud E. Hermansen & Donald R. Richards, *Maine Roads and Easements*, 48 Me. L. Rev. 197, 200-02 (1996). Here, Rich's right

---

[19] At oral argument, Mr. Israel conceded that an easement had been created, but argued that it was an easement with a latent ambiguity.

13

to use the parking lot was the dominant easement and Unobskey's obligation to allow the use the servient easement. The "construction of language creating an easement is a question of law . . . ." *Stickney v. City of Saco*, 2001 ME 69, ¶ 53, 770 A.2d 592, 610. The "scope of an interest in land conveyed by a deed is properly to be determined solely from the language of the conveyance, provided that the language has plain meaning." *Badger v. Hill*, 404 A.2d 222, 225 (Me. 1979). If the language of the deed is ambiguous, however, "extrinsic evidence may be considered to determine the intent of the parties." *Anchors v. Manter*, 1998 ME 152, ¶ 16; 714 A.2d 134, 139.

> Marden's succinctly argues:
>
> For valuable consideration MetLife acquired the right in common with Plaintiff and others to access and use the parking lot. These rights, which were acquired by MetLife upon Plaintiff's default, were freely assignable and ultimately acquired by Defendants. Plaintiff cannot now attach a price tag to Defendants' exercise of these rights.

*Def.'s Mot.* at 3-4. The Court agrees with Marden's. The language of the easement is unambiguous:

> As . . . security . . . [Unobskey's] hereby transfers . . . to [MetLife] . . . the right to use in common with [Unobskey] . . . all Common Areas, which shall include all parking areas and other facilities of any kind or nature shown on Exhibit A to the Lease.

DSMF Attach. 5. Unobskey transferred to MetLife the right to use the parking lot.

Other than positing latent ambiguity, Unobskey did not directly respond to Marden's easement argument. Instead, it asserts that Rich's use of the parking lot was part and parcel of its obligation to pay rent for use of the building. *Pl.'s Opp'n* at 3. Moreover, Unobskey argues, while the right to use the parking lot was subject to the mortgage, "that right did not belong to Unobskey at the time the mortgage was executed – it belonged to Rich's pursuant to the lease

which was executed seven months prior to the Mortgage." *Id*. (citing *Dorman*, 82 Me. at 448, 19 A.2d at 916 ("One can not convey land, nor create an easement in it, unless he owns it.")).

The Court is not convinced. As Marden's points out, Unobskey's argument is based on the faulty premise that the parking rights granted to Rich's were exclusive. They were not. All downtown merchants – Unobskey renters or not – were allowed to use the parking lot; thus, Rich's use of the parking lot was not tied to its rental agreement with Unobskey. Further, Unobskey's argument is undercut by what the lease did not say. Unobskey could have limited the transferability of the right to use the parking lot upon foreclosure.[20] It did not. To the contrary, when Unobskey mortgaged the property to MetLife, it expressly included the right to use the parking lot as a part of the security. Whatever argument Unobskey may have had about the integral connection between the Rich's lease and its obligation to make lease payments for the building is severed by Unobskey's decision to include the right to use the parking lot as part of MetLife's security.

The Court need go no further. The Court concludes that Unobskey conveyed to MetLife an express easement to use the parking lot, and that Marden's acquired this right when it purchased the building from MetLife.

## IV. CONCLUSION

The Court DENIES Plaintiff's motion for summary judgment (Docket # 15) and GRANTS Defendants' cross-motion for summary judgment (Docket # 19).

---

[20] For example, Unobskey could have insisted that upon foreclosure the right to use the parking lot terminated or that MetLife was required to offer the easement to Unobskey at an agreed-upon price.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 9th day of November, 2007